Rich Phillips here on behalf of the appellant, Columbia Hospital Medical City at Dallas, doing business as Medical City Dallas Hospital. In this dispute between a medical provider and a payor, IMA, the payor, would really like to have its contract and defeat it too. Medical City Dallas Hospital treated a patient who's a member of a health plan administered by the hospital's claims for that treatment. And when it finally did pay something on those claims, it expressly took advantage of discounted rates in the hospital agreement on the items for which it decided to finally reimburse. But now, IMA argues that it can take full advantage of that contract, but at the same time, not have to arbitrate under the terms of that contract. This court should reverse the district court's refusal to compel arbitration on two because IMA knowingly sought and received benefits of the hospital agreement. And second, and independent of that, the network of agreements here that create this PPO arrangement constitutes a unified contract, and IMA is therefore bound by the hospital, the arbitration agreement in the hospital agreement. Turning first to direct benefits estoppel, this court has noted that direct benefit estoppel prevents a party from selectively benefiting from a contract while also at the same time avoiding its burdens. It applies in two different circumstances. The one relevant here is when a party knowingly seeks and receives the benefits of a contract with an arbitration provision. Contrary to IMA's argument in this court, it is not limited to parties that are closely related or that are affiliates, and the court should reject IMA's attempt to add a new requirement for direct benefits estoppel. For this prong of direct benefits estoppel, the only two requirements are knowledge and receiving a direct benefit. The district court here rejected direct benefits estoppel on the first prong only. It did not reach the question of direct benefit, but instead found that IMA was not aware of the contract, and that rejection is based on two legal errors about knowledge. First, the district court relied on the fact that IMA denied having subjective knowledge of the arbitration provision. Twice in the opinion, the district court said that IMA did not have knowledge of the terms of the contract and specifically knowledge of the arbitration provision. That's not the right test. This court rejected that test in the Vlaubert case, Vlaubert-Prett v. Lloyds Register, which is a case involving a forum selection clause but again involved direct benefits estoppel in the same test. In that case, the party argued that it didn't have specific knowledge of the forum selection clause. This court rejected that argument and said specific knowledge is not required. And tellingly, IMA makes no effort in this court to defend that part of the district court's reasoning. The second legal error the court made was by saying that merely having knowledge of the rates, the reimbursement rates, was not sufficient knowledge of the contract, the hospital agreement. And that's because the court found that the rates are found in an attachment to the hospital agreement and the district court said that's a knowledge of an attachment, not knowledge of the contract. But the law is clear on this one, black letter law, that attachments to a contract are part of the contract. So knowledge of the rates is knowledge of the contract basic terms. So the district court's two primary reasons for saying that there was not knowledge should be basic terms of this contract. When it took advantage of the agreement, it was indisputably aware of the terms. First, IMA pre-approved the surgeries. It confirmed in doing so that the hospital was an in-network provider for this plan and for this patient, which requires knowledge of the hospital agreement. There's uncontradicted evidence in the record. It's at record page 591 in the form of an affidavit that says what that pre-authorization was. IMA denies this but cites no evidence to the contrary. Instead, simply asserts that this pre-authorization was nothing more than saying that the person was a member of the plan. But again, the evidence in the record, the only evidence is that it was more than that. We'd also have cited the court to Texas Insurance Code 1301.135, which discusses pre-authorization and what pre-authorization is. And it's a good example of what involved in pre-authorization and it is not simply acknowledging that the person is a member of the plan. Second, when IMA paid these claims, two years later, almost two years later, it indisputably had knowledge of the discount rates. When they sent the payment in the explanation of benefits, which is found in the record at page 657, they specifically said for the things that they were paying, they were paying based on the discount schedule. And they took $300,000 in discounts based on that schedule. Now, IMA says that they were paying based on what it could confirm to be the reasonable rate, but the EOB, the thing they sent us, disclaims that entirely by specifically referencing those terms. Mr. Phillips? Yes, sir. If I don't see that the district court applied a heightened knowledge standard, is the question before us then whether the district court clearly erred when it held that IMA's contract 10 years earlier didn't put it on in knowledge of the hospital contract with the arbitration provision? Is that the question before us? Again, I don't think it's a matter in finding that the contract was 10 years before their contract with PPO Plus. That's irrelevant to the question of whether they had knowledge of the hospital agreement. Right. I agree. But is the question before us whether the district court made a clear error of fact if I don't think that the district court attached a heightened knowledge standard of the arbitration provision? Are we then assessing did it clearly err and with primary reliance, therefore, your argument is the pre-authorization, the partial payment, and this October 2016 letter? Is that basically the issue that we're looking at? I still think it's an error of law. The facts here are not really in dispute. What they were aware of is not in dispute. They were made specifically aware of the payment terms. Record page 349 to 52 is a letter that was sent while they were deciding what to pay. So I don't think there's a dispute about what knowledge they had. I think the dispute is about what the effect of that knowledge is. And is it enough? But aren't they saying, I mean, the payment dispute itself is complicated, but here we're just asking who will resolve it. And if the letter is the best evidence, isn't that letter primarily HealthSmart owing those rates? Well, the letter is not about whether HealthSmart owes the rates, but about IMA. And also the fact, again, I'd point to the fact that when IMA itself paid, it sent an EOB that the bottom says we're paying based on the discounted rates in the hospital agreement. I'd like to ask you a question about these rates in the hospital. The rates are an attachment to the hospital agreement. Correct. And surely in that course of 10 years, the rates would change from time to time. Well, again, the 10 years was the IMA PPO plus agreement. I'm not exactly sure how far before this. But the hospital agreement still would have had some ability to modify the rates, would it not? I believe that's correct. I'm not sure that is discussed in the briefs, but I imagine that there was some mechanism. I suspect there's a provision for that. And if so, then the attachment would have to change from time to time, would it not? I believe that's correct, Your Honor. So IMA would have to be aware of the changes, of the fact that the agreement authorized changes and the changes were made in the rates, would it not? It might have to be, but here on the facts, the claim, the discounted rate that they paid is the discounted rate that everybody agrees was the correct amount. Well, what I'm saying is they know that this agreement is evolving over time and they are going to go with the flow as it evolves over time, which seems to me a de facto indication that this is, that they're accepting benefits. You quote Judge Calabrese as saying that non-signatories who receive lower insurance rates and ability to sail under the French flag due to a contract signed by other parties were bound by the arbitration clause. I mean, that seems to me very close to what we've got here. I absolutely agree with that, Your Honor. And the fact that when they paid, they paid on that claim, it indicates that they had knowledge of that amount. The district court did not reach the second part of the test on direct benefits estoppel, which is whether they received direct benefits. IMA says this court should defer to the district court's findings, but there are no findings to defer to. Was this a PPO agreement where the patient would be ultimately responsible for any amount that went unpaid or was this like the federal government where we get all the benefits? This did protect the patient from balanced billing. Yes. The patient was responsible only for a certain amount and they were protected from balanced billing. Is the logic of your opinion, therefore, though, that IMA, at least now, would be on notice of any of its downstream providers' agreements that they might have an arbitration clause? To the extent they're taking advantage of those agreements to pay discounted rates, then yes, they're also responsible if they have arbitration clauses. That's law of direct benefits estoppel, which is you can't pick and choose the provisions that you like while avoiding the ones you don't. Similarly, the hospital might accept lower rates under the knowledge that it could arbitrate rather than have to go to court. Exactly. That's the reason we have direct benefits estoppel. IMA argues that it didn't directly benefit from the agreement. As we've discussed already, they did. They took advantage of the agreement by getting the lower rate when they decided to pay. IMA's agreement with PPO Plus specifically says, please go out and create a network. Again, the network of contracts here, as they function, they don't work without each other. That's part of the unified contracting, but also applies here in that IMA, when it signed its agreement with PPO Plus, said, please go out and make as many contracts as you can with a broad geographic network with providers so that we can offer these services and discounts to the members of the plan we administer. Does it affect this situation that there's no payer acknowledgement? That relates not to direct benefits estoppel, but to the unified contract theory. On that, I would say no. The reason I would say that is the courts have recognized that a separate document called a payer acknowledgement is not required. That's in the Scott and White case and the GPA holding case. Both hold a separate acknowledgement is not required. All that's required is that the payer agree to pay and be responsible for the charges. IMA did so in its agreement with PPO Plus by agreeing to pay claims of participating providers in accordance with the applicable plan. Scott and White is a federal case and we're not bound technically by federal district court cases. What state law do you have on that, if any? I would point to, well, I think that we're applying state law there. I agree you're not bound by Scott and White. I think it recognizes that the idea that a separate agreement, which is what IMA argues is required, is not the law. It's simply what's required is an acknowledgement that they're agreeing to be bound. I think that would be the case. IMA tries to argue that the benefits it received were indirect somehow. One of the cases they point to, I think, actually supports us. It's the Phoenix Company's case. In that case, the benefit was found to be indirect because it came from signatories exercising their contractual rights, not someone else. But here, we're different from that because the exercise that invokes the arbitration agreement is IMA exercising its right under this network of agreements to take advantage of the discounted rates. I think that, again, it emphasizes why we have a direct benefit here. We've pointed the court to the Tankara shipyard case from the Second Circuit, which this court cited favorably in the Hellenic case. In other Second Circuit cases about what is a direct benefit versus an indirect benefit, IMA says it's not Fifth Circuit authority, but they haven't pointed this court really to any real test for direct benefits, other than trying to argue that it has to be some sort of close affiliate relationship, which none of the cases require. In fact- This is a very important case regarding direct benefits, isn't it? Yes, Your Honor. It impacts how these sorts of medical provider networks are going to operate. If IMA is correct, then hospitals are going to lose the benefit of these arbitration agreements, and we would allow these payors to pick and choose the provisions that they like in these contracts as these networks are put together. We think it's important that the court hold IMA to the contract that it sought and received the benefit of, and that it needs to arbitrate this dispute. If the court has no further questions, I'll yield the 10 seconds I have left and come back and rebuttal. All right. Thank you. Thank you. All right, Mr. Pibus. May it please the court. My name is David Pibus, and I represent IMA, the appellee. This appeal involves an attempt to bind a non-signatory to an arbitration agreement. Even though it didn't bring the lawsuit, it didn't have knowledge of the agreement during the transaction, and it never promised to comply with the agreement. I want to go over each of those in turn. First, I'd like to discuss the importance of IMA's position as a non-signatory who never sued Columbia. And second, I'd like to address IMA's lack of knowledge of the hospital agreement in connection with the direct benefits estoppel doctrine. And third, I'd like to talk about why it's important that IMA never promised to comply with Columbia's hospital agreement in connection with the unified contract doctrine. So turning to IMA's role as a non-signatory who didn't sue Columbia, this court has said that arbitration agreements apply to non-signatories only in rare circumstances. And that's from the Breedis case by the Fifth Circuit. IMA is a non-signatory, but not just a non-signatory, it's a non-signatory defendant. Columbia filed the arbitration against IMA, which then filed this suit to prevent the arbitration. But IMA is the defendant. The Fifth Circuit has never forced a non-signatory defendant to arbitrate. It's never- By state law, really. That's right. Does he have his five minutes? Neither has Texas. But in terms of direct benefit, in terms of these doctrines requiring someone to arbitrate, I believe that that's federal law. As far as we can find, neither has any other circuit ever forced a non-signatory to arbitrate when they didn't bring the lawsuit. There are a small number of district court cases, but I would suggest to you that each of them have facts that overcome that issue in some respect, like maybe the defendant had previously sued on the contract or the defendant had actually signed the contract, so it really wasn't a non-signatory. The Fifth Circuit has sharply distinguished cases involving non-signatories who haven't sued from those who have, and that's in the Breedis case versus the government of Turkmenistan, where the Fifth Circuit refused to bind the government of Turkmenistan to arbitrate or to an arbitration award, even though the government knew about the agreement, knew about the clause, was repeatedly involved in choosing the entities who would be a party to the agreement, and appears to have benefited from the agreement. The court said it is not enough, therefore, that the government benefited from the existence of the joint venture agreement. And the Breedis case had a quote that other courts, including the Fifth Circuit, have quoted that really talked about the importance of this non-signatory defendant status. And here's what I'm going to quote from it, from Breedis. They said this, there's an important distinction, however, between cases where the courts seriously consider applying direct benefits estoppel and the case at bar. In the former, the non-signatory had brought suit against a signatory premised in part upon the agreement. Here, it is undisputed that the government has not sued Breedis under the agreement. The government has thus not exploited the joint venture agreement to the degree that the cases that consider applying this version of estoppel require. For this case, really, Breedis is dispositive in that respect because of the roles of the parties. Now, since Breedis, two Fifth Circuit cases have described the direct benefits estoppel doctrine in ways that Columbia is trying to use to force IMA to arbitrate, even though it's a non-signatory defendant. Those two cases are Noble Drilling and Lloyd's Register. But both those cases involved claims by a non-signatory. The non-signatory was bringing suit. It was not a suit against the non-signatory as Breedis is involved. So Columbia is asking this court to use the direct benefits estoppel doctrine to do something it's never done in which the Breedis case forecloses. The next thing I'd like to do is talk about Noble Drilling's requirement that IMA knew about the hospital agreement. Noble Drilling, in the Fifth Circuit, the Noble Drilling case involved a purchaser of rope who did bring the lawsuit, but they weren't suing on the contract that had the arbitration clause in it. So the court had a little bit of a quandary because it didn't have the sharp rule from Breedis because this party was actually suing. So what they said is, well, if they added a test, they said, well, the non-signatory knowingly exploits the contract containing the clause and it obtains a direct benefit that they would bind them. Now, Noble Drilling required knowledge of the contract during the transaction. By knowledge, the court meant having a copy of the contract and having it by the time of litigation was not sufficient. And during the contract meant, in that case, at the time, Noble Drilling ordered, purchased, and received the ropes. In other words, when Noble's making its decisions about whether to engage in the transaction, it needs to have a copy of the contract. Let's talk about what IMA knew. IMA's contract with PPL Plus is back in 2002. And the purpose of that contract is to permit IMA and its plans access to the PPL Plus network. PPL Plus contracted with HealthSmart that same year to give access to providers in Texas. Columbia didn't sign the hospital agreement with HealthSmart until 2012, nine years later. There's no evidence IMA knew about that. The surgeries in question here were in February of 2016, and IMA did not have a copy of the hospital agreement at the time of the ask. IMA probably could have gotten a copy of the hospital agreement and put it in its files for appropriate use if and when a very large-scale medical set of procedures were being sought for pre-approval. I don't know if that's true or not, Your Honor. It's possible it is true. Of course it's true. Okay. Well, you may be right, Your Honor. But I would suggest to you that IMA has hundreds, hundreds of potential providers, many members. This plan is not the only plan that it manages. It has a huge number of procedures coming through in transactions. Of course. And IMA makes money off of paying the least amount of money for the greatest number procedures. Well, IMA protects its plans to which it has a fiduciary duty, and it did not have a copy of this contract until 2019. IMA didn't know the amount of the discounts at the time of the surgeries. It relies on PPO Plus. PPO Plus keeps those contracts in its file, and it reprices the procedures, the costs, given the rates. Let me say a little quick thing about these rates in this schedule. Can I just ask, as you say it, the broad way I'm thinking about it is, on the one hand, they had knowledge that there must be a provider agreement out there as to each hospital. So they did know these agreements existed. And then opposing counsel has said there are sort of three ways they must have known about this one. One is their payment corresponded directly to this Columbia Hospital agreements payment schedule. Two is they preauthorized it as to this patient. And the third is this October letter. So at the broad scale, I guess the situation that your clients in would have known of these provider agreements. And then at the narrow specific, the Judge Atlas must have clearly erred attributing knowledge because of those three points. Is that a fair way of thinking of what we have to decide here? I think it does list the issues, and I'd like to address each one. First of all, on the issue of whether it must have known, that's not the test. And in the Noble drilling case, that the purchaser of rope bought it through the distributor. It had approached the manufacturer and went to the distributor at their direction. So they must have known that there was a distribution agreement, but it didn't matter what they must have known. IMA doesn't. There are hundreds of these agreements, and it assumes they exist, but that's not enough for this test. With regard to the payment and the authorization for the payment, let me address that in just a minute. IMA is simply confirming that this person is a member of its plan, and I will agree that they are confirming that the hospital is part of, is a preferred provider, but they're not making any statements about what the contract requires or the contents of the contract. And let me make a point about that schedule that they did not have a copy of. The court assumed below that they had a copy of the schedule, and that's not true. In the record at page 148, it explains that. The court assumed it, but said it didn't matter that the schedule's not good enough. But let me point out what the schedule attaches. It does not show how much these surgeries cost. It shows a percentage discount. You still have to come up with the usual and customary charge. And the argument in this case that's not before the court is whether Columbia can charge amounts that are usual and customary. So all that's in that schedule is a 25% discount. You still have to know what the top line number is, what's usual and customary. So returning to the timeline, IMA, the Lloyd's Register case, which talked about this test as well, and it says if the non-signatory receives a copy of a heretofore unknown contract for the first time when it is not enough for knowing exploitation of the contract under this version of direct benefits estoppel. And that's what we have here. Now, let me turn to your question, Judge Higginson, about the letter into October 2016. This letter was to HealthSmart, wasn't IMA, which is revealing in itself. But that letter in October 2016 is eight months after the surgeries. At that point, it's too late. The surgeries are performed. IMA can't make any other choices. It can't send this person to a different provider. It either owes the money or it doesn't at this point. If you look at Noble Drilling, it talked about the importance of knowing about the contract at the time they ordered the rope, received the rope, during the transaction. This is really after the transaction. Now, Columbia argues, well, you paid these amounts. You took the discount. Well, that's right, because IMA paid the amounts it's required to pay under its contract. Paying what you believe you owe is not a ground for estoppel. It's entitled to those discounts under the network. The only real dispute was how much should the surgeries cost. And if you at this letter, you see the real dispute here. It says that Columbia doesn't believe it's limited to charges that are reasonable and customary. That's really the dispute. And IMA says, no, you overbilled for this. Now, I'd like to talk about... Do you have an easy record site for your statement that IMA has hundreds of providers, each with their own contracts? That's in the affidavit that's at 147, ROA 147. And you don't think it's disputed that your client had a copy at the earliest as 2019, or is the response there that you may not have had a copy of the full contract, but you knew the basic terms? And that, I guess, is a legal question. In order to trigger DBE, direct benefits estoppel, what would you say are the basic terms that must be known? Well, that's a great question. What they knew back in, at the time of the surgeries, all they knew was that this is a preferred provider. That's all they knew. They didn't have even the rates. Eventually, they got billed from PPO Plus, and the PPO Plus had applied the discount. But at that point, they started looking at the usual and customary charges, the top line number to say, is this usually customary? And they asked the hospital for some backup and the hospital didn't want to give it in terms of costs. So then the hospital wrote to HealthSmart after... That's none of that post authorization evidence is relevant to whether you had knowledge or not, in my view. I agree with that, because at the time of the surgery, the only knowledge was, this is a member of the plan, and this is a preferred provider. Well, I doubt that IAMA is so naive that they would have known that one preferred provider had a better track record of keeping within the bounds of usual and customary than another one did. Because again, that's how IMA makes money. I don't know that that's true, Your Honor. IMA charges a basic fee, I assume, to the plan to manage these things. Its obligation is to help the plan. We can't speculate on that because some of these plans have self-insurance provisions for whoever the ultimate provider is. So we can't really speculate on the ultimate deal. What we do know is that IMA's business is to pay the least amount for the greatest amount, admittedly under fiduciary duty. But to say that IMA is just, you know, a sheep among wolves, assessing who's preferred provider is hardly credible to me. Well, I think that it's my assumption that the patient can choose from any preferred provider, and that IMA does not reroute them as long as they're in the system. And all IMA is doing is saying they're in the system. And then after the fact, IMA has the right to make sure they're not paying more than what's usual and customary. And there's an appeal process that the hospital could have invoked under ERISA, and they did not do so. I'm curious, because it is an area of law the two of you know well, I am just curious your view as to which would be more disruptive. In other words, if the time to assess knowledge of basic terms is at the time that Columbia rendered the service, the surgery, and you do acknowledge at that point you knew they were a preferred provider, how disruptive would it be? Or would it be not disruptive at all for us to then say your client had a duty to inquire as to all of its providers contracts? And if that is the rule of law, then how would your client then be able to say, I don't want to have to arbitrate? Could they extract from these agreements? Is there a moment of choice at this point? Well, I think if you make that the rule, they're going to have to go back and ask everybody for their contracts, and they're going to have to remove people from the system if they don't like their contracts. But for right now, that's not how it works. For right now, as we're going to talk about these payor acknowledgments, there are ways the hospital can require the IMA and people like that to agree to pay their fees and be responsible for them. And they didn't meet this case. Can you help me a little bit of what the process you alluded to under ERISA, the opportunity to appeal that they did not avail themselves of? How does that work? Well, there is a deadline under ERISA that whereby, and it's in the plan as well, which is also in the record, where the hospital, if it doesn't like the determination about what is usual and customary, can appeal it. And IMA has to send that out to a third party. And if they don't agree with that, I believe they can bring a suit in court to challenge the result. But IMA is limited to what's usual and customary. And that's like it's in ERISA and it's in the plan as well, which is in the record. I was just trying to fit together the private arbitration going completely outside and the provision by the government internally for the review of the same dispute that you took into arbitration. Right. It's the same dispute that would go to arbitration would have been prosecuted under this provision of the IRS. ERISA. Yes. Sorry. All right. Let me go. My time is almost running out. A quick point about that. Sorry. It's the same dispute. Yes. Whether there was a statutory or rule provision that parties could avail themselves of. And that would be true regardless of any provisions in the contract. Right. So it's against that backdrop, then, that we look at the question of arbitration. Yes. Your Honor, I want to talk briefly about the uniform, unified contract idea and the various cases with a payor acknowledgement. The key in those cases is that those payor acknowledgements and the subscriber agreements where they bound the TPA, they had a promise to comply with the agreement, not simply a promise to pay the claim. That's the key. And there's no promise here to comply with the hospital agreement. With that, I am out of time. Thank you. Okay. Thank you very much. Mr. Phillips, rebuttal. Thank you, Your Honor. I want to start quickly, hopefully quickly, on ERISA because I think that's a red herring. We have not sued under ERISA. We have sued to enforce an independent duty that exists outside of ERISA. The plan defines usual and reasonable charges to be the same as the contracted rates here. So ERISA really does not apply. This is not something that's being done in the sort of shadow of ERISA. And I would point out briefly that in their brief, IMA claims that arbitration somehow is prohibited by a section of the CFR that they cite, but nothing in there prohibits arbitration for claims that are outside the plan. This is not an ERISA case, and ERISA doesn't really have anything to do with what we're doing here today. Next, I want to talk a little bit about this idea of whether or not it's important that IMA is the defendant or the plaintiff. They want to focus on one part of the test from noble drilling. There are two ways to have direct benefits estoppel. One, as the court recognized in noble drilling, is if a party sues to obtain benefits of a contract. But the second one, and it is stated in the disjunctive in noble drilling, knowingly seeking and receiving benefits of a contract with an arbitration provision. IMA asked this court to write that one out, to say that doesn't apply. And that's simply not the right test. On lack of knowledge, I think there's a few things we need to talk about here. Mr. Pivas talks about the difference in time between their contract with PPO plus and the hospital agreement here. But IMA expressly told PPO plus, go out and create a contract. In the IMA PPO plus agreement, there's a provision that says, here are the terms we would like to see in these kinds of contracts that you go sign. So now IMA says go do that. And then it wants to bury its head in the sand and say, we don't have to do anything to educate ourselves about the terms of those contracts. We're just going to take advantage of them. And then if there's something we don't like, we'll refuse to comply with it. And that is not what the law allows them to do. I think it's significant that the preauthorization we've discussed here is evidence that IMA knew not just that she was a member of the plan, but knew that it was an in-network procedure. And to know it's an in-network procedure, they had to know that there was an in-network agreement with our hospital on which we were providing discounted services at an in-network rate. And when they provide that preauthorization, that is knowledge. That's evidence of knowledge of the basic terms of the agreement. And I think those basic terms, to answer a question from Judge Higginson, are the identity of the parties, the idea that it is an in-network. In this situation, it is going to be fact-specific to the particular kind of case as to what basic terms are. But here, it's the identity of the parties. It's the fact that there's a provider agreement that allows provision of services at an agreed discounted rate. That knowledge was there. And that there is a federally prescribed or offered avenue for resolving disputes. Well, again, that's ERISA. To find a role for the red herring. Again, we haven't sued under ERISA. We're suing for an independent claim. I didn't make myself clear, but I will. Go ahead. I didn't mean to interrupt you. Go ahead. Do parties agree to arbitrate ERISA disputes? I'm not sure if they can or can't. It doesn't apply here. This isn't an ERISA dispute. It's a dispute that arises outside of that plan. It's a dispute that arises because of an agreement between the provider and the payer. That's a relevance it might have to the assertion that by invoking the discount rate that this described them, brought them into this entire contract arrangement, when the ultimate dispute about where the push comes to shove is not dealt with. But there is a stamp industry-wide availability for resolving those fees. That's the sense in which I asked the question about its relevance. And I don't know how much purchase it has, but I can agree that it's just a red herring. I think it is part of the matrix in which this has to operate. It may be, and it may be part of the matrix in the merits. But certainly in deciding whether this thing needs to be decided in court or in arbitration, the relevant contracts, the relevant agreements are not the plan documents, which are covered by ERISA, but these other documents. And this claim exists outside. You're saying that they reached in to take advantage of the listed rates that are there and that by that they brought into arbitration. But the reality is that that does not necessarily mean that that's going to be the mechanism for resolving the disputes, that there's another operative procedure out there. I just raised the question because I wanted to get you an opportunity to deal with it. And I understand your response. Yeah, and I think briefly, and I know my time is up, but I think the key thing here is they expressly invoked the contractual discount. Mr. Pivas says all this stuff about reasonable and customary rates that they could verify, but look at the EOB. It's in the record, page, I think it's 657. I'll confirm that. But at the bottom of that EOB, yeah, it is page 657. There's a footnote. And it says that what they agreed to pay us was based on that contract. And they were invoking the terms of the contract to pay. ERISA was not litigated or argued in the district court, was it? It was not, Your Honor. All right. We have your argument, and we appreciate it very much. It's another well-briefed and well-argued case, and we thank you for your time. Thank you, Your Honors. Thank you, Your Honor.